[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Marion Mixon, filed an action against the defendant, Weatherby Associates Inc., seeking a recovery for wages allegedly owed to her by the defendant. Prior to the action, the plaintiff had been employed by the defendant, an agency specializing in the placement of medical personnel. The plaintiff alleged that the defendant owed her commissions earned by the plaintiff before her employment with the defendant terminated.
Both parties presented evidence supporting their respective claims during a trial in November of 1997. The parties filed post trial memoranda on January 2, 1998. The defendant filed an additional brief on January 22, 1998. CT Page 5384
There are a number of issues raised by both parties at trial and in their memoranda. Each of these issues are important in that a decision on any one affects the figures used by the parties in their calculations. The main points of contention are: 1) the amount of "draw" specified in the plaintiff's contract of employment; 2) the date on which the "Drew" commission occurred; 3) the validity of four disputed accounts; and 4) the amount of bonuses previously tendered. Additionally, there is an allegation of bad faith on the part of the defendant.
The "Draw"
The contract between the plaintiff and the defendant calls for a salary of $30,000 per year. (Plaintiff's Exhibit 1). $25,000 of this salary is base pay, while the remaining $5,000 is the "draw." (Plaintiff's Exhibit 1.) The contract provides that "the draw will be repaid after Ms. Mixon [the plaintiff] reaches the $100,000 billing/cash receipts level." (Plaintiff's Exhibit 1.)
According to the plaintiff, the first year receipts generated by the plaintiff were well below $100,000 and thus the defendant was only entitled to a repayment from the second year of employment when the receipts generated did exceed $100,000. The defendant relies on the explicit language of the contract in arguing that the contract does not provide any sort of temporal frame but simply states that the draw is to be repaid after the $100,000 receipts level is reached. As such, the defendant feels that it is entitled to a draw of $10,000 — $5,000 for each year worked by the plaintiff once the plaintiff reached the $100,000 level in her second year.
At trial, Ms. Barrachina, the witness from the Connecticut Department of Labor, used a draw figure of $10,000 in creating a non-final estimate of commissions due the plaintiff.
The commission from the placement of Dr. Drew
In her post-trial memorandum, the plaintiff argues that evidence adduced at trial now supports a claim that the manner of calculating the commission earned by the plaintiff from the placing of Dr. Drew was erroneous. She argues that the commission of $20,000 should have properly been split over the course of the two years of the plaintiff's employment in order CT Page 5385 to reflect the nature of the payments rendered to the defendant. As such, half of the sum was improperly charged to the first year of employment, when the actual final payment of the fee stretched across the second year. (Plaintiff's Exhibit P.)
The defendant argues that the policy of the defendant, in compliance with standards enacted by Connecticut, is to assign commissions to its agent on the date of placement, and not when the defendant is ultimately paid by the prospective employer of the newly placed physician. Accordingly, the placement of Dr. Drew occurred in the first year of the plaintiff's employment and thus must be reflected in the commission calculation for the first year of employment as well.
The plaintiff's reliance on testimony adduced at trial is misplaced and the attempt to split the commission earned from the Dr. Drew placement is without merit. The plaintiff argues that the defendant's President testified that "commissions were never earned or paid until payment was received from the institution." The plaintiff misconstrues this statement. According to the Connecticut Labor Department, "The bonus percentage must be determined, therefore, at the time of placement, not upon receipt of payment." (Plaintiff's Exhibit I.) The testimony of the defendant's President is entirely consistent with the fact that, while commissions are determined at placement, the commissions occasionally are not paid until payment is received. That full payment was not received by the defendant until the plaintiff's second year should not change the date of placement, the date the commission was said to be determined or "earned." In exhibits offered at trial, the plaintiff's charts place the Drew commission squarely into year one of the plaintiff's employment.
FALL-OFFS
The policy of the defendant was to assign commissions due to its employees when placement of personnel was made with the perspective employer. However, to account for placements that failed to survive the "guarantee period," the defendant had a fall-off policy that would reflect the lack of ultimate success for the placement. In effect, if a fall-off occurred, the employee's commission would be readjusted to show that actual placement never occurred and thus a commission was not due for that particular placement. CT Page 5386
There is a difference of opinion as to how a fall-off was to be calculated. The placement of personnel consisted of two parts. One part dealt with the actual client, (institution) while the other part dealt with the potential future employee. The defendant's practice was to offset both parts from their employee's commission when a fall-off occurred. Ms. Barrachina, from the Labor Department, noted that the usual practice in the industry was to offset only the part of the commission dealing with the failed future employee and not the client should another placement be made.
The court is impressed with the testimony of Ms. Barrachina as to the general practices in this specific industry. As stated by Ms. Barrachina, one such practice, when fall-offs occur, is to credit the employee for work done with the potential employer even though a fall-off occurs when the would-be employee fails to complete the proposed term.
The court finds that under the circumstances of a fall-off, a benefit is received by the defendant in that the necessary groundwork for subsequent placement with the same employer has been accomplished. Therefore the plaintiff should be compensated for her efforts in securing the placement from which the benefits to the defendant are derived. Compensating the plaintiff for securing the future employer is consistent with the fact that commissions consist of two distinct parts. The first part consists of work done with the institutional client. The second part is earned for work done with the individual candidate.
The plaintiff and the defendant dispute the occurrence of four fall-offs.
The first two disputed fall-offs involve the placement of Dr. Serrano with Sunbelt and the placement of Dr. Thompson with Upper Chesapeake. In its post-trial memorandum, the plaintiff argues that the defendant has offered insufficient proof at trial that these fall-offs ever occurred. The plaintiff questions the defendant's assertion that these fall-offs occurred and suggests that the court challenge the credibility of the defendant on this issue. The defendant maintains that these fall-offs did occur and argues that the shows that the plaintiff's own testimony at trial admits that these two fall-offs actually took place. (The defendant's reply brief of 1/22/98, citing TR 24 at line 19-20.) Moreover, the defendant CT Page 5387 maintains that other evidence was produced at trial that shows that the Thompson and Serrano placements were written off as fall-offs. However, as the plaintiff secured the institutional sides of placement prior to the fall-offs of the individual physicians, the plaintiff is entitled to a portion of the commission. (Defendant's Exhibit 8.)
The third disputed fall-off concerns the placement of Dr. Naon with Multicare. The plaintiff offered a letter from the Credentialing Coordinator of Multicare as evidence that Dr. Naon was successfully placed with that facility. (Plaintiff's Exhibit Q.) This letter states that Dr. Naon was, and continued to be, on the active staff of two hospitals for a period of nearly three years. The defendant maintains that this letter merely refers to hospital privileges and does not address any issue concerning employment. In this regard, the defendant offers the business notes of one of its employees as indicative of the fact that the placement of Dr. Naon was never successfully completed. (Defendant's Exhibit 6.)
The final fall-off in dispute concerns the placement of Dr. Moussa with St. Joseph's Hospital. At trial, the plaintiff offered evidence which allegedly shows that Dr. Moussa was actually placed with that hospital. (Plaintiff's Exhibit R.) This evidence consists of a letter from the medical staff secretary of St. Joseph's in which the staff secretary states that Dr. Moussa was granted temporary privileges in September of 1992. Plaintiff's Exhibit F, however, contradicts Plaintiff's Exhibit R. Exhibit F contains the copy of an attached check an a letter from the president of the defendant to St. Joseph's Hospital in which the defendant returns the placement fee paid by the hospital for services rendered in connection with Dr. Moussa. The check consists of an $18,000 return from a total fee of $20,000. In her post-trial memorandum, the plaintiff now argues that she is due a commission on the $2,000 retained by the defendant.
The defendant maintains that Dr. Moussa was never actually placed with the hospital. In support of this argument, the defendant points to Plaintiff's Exhibit F as documentation for the fact that placement never occurred. The defendant argues that the $2,000 retained by it is a negotiated fee for services rendered to which the plaintiff has no right of commission.
The court finds that the plaintiff should not recover a CT Page 5388 commission from the $2,000 kept by the defendant. The agreement between the parties allows a commission to be earned after a successful placement within the guarantee period. In the case of Dr. Moussa, there was no placement within the guaranteed period and thus, the plaintiff had not earned any portion of a commission on the funds retained by the defendant.
Bad Faith
In its post-trial memorandum, the plaintiff illustrates three specific instances where the defendant allegedly acted in bad faith when dealing with the plaintiff. The plaintiff claims that "[t]here is no other explanation for: 1) its [the defendant's] false report to the Connecticut Department of Labor that it had paid its check #9655 to the plaintiff; 2) its demonstrated false report that the Multicare/Naon placement was a `fall-off'; and 3) its claim that the $2,000.00 `net professional fee' on the St. Joseph/Moussa placement should not be subject to a commission payable to the plaintiff."
The first allegation of bad faith revolves around a specific check, #9655 in the amount if $2,475.00, the plaintiff claims that the defendant reported it paid to the plaintiff when, in fact, it was not. This check was incorrectly incorporated in the various lists as a paid bonus and according to the plaintiff, must now be corrected.
The defendant in its post-trial memorandum acknowledges that this amount was wrongfully credited toward the total bonuses paid the plaintiff. However, the defendant denies the existence of any bad faith in this mistake. According to the defendant, it simply relied on information submitted by the plaintiff. This information, accordingly, listed the errant check as paid. (Defendant's Reply Memorandum, pp. 8-9.)
The arguments and relevant exhibits concerning the other specific instances of bad faith by the defendant, the Dr. Naon placement and the Dr. Moussa placement, are discussed in the preceding sections. In both of these circumstances, as in the case of the improper allegation of a paid bonus check, it cannot be said that bad faith is the sole explanation for the acts committed by the defendant. The defendant has offered sufficient arguments to explain its positions and actions. The court concludes, therefore, based on the parties' briefs and the exhibits in evidence, that there is no evidence to support a CT Page 5389 finding of bad faith on the part of the defendant. According to the defendant, Ms. Barrachina of the Labor Department reached a similar conclusion, and testified that there was no evidence of bad faith.
Accordingly, the following elements should be including in calculating the extent of any remaining wages owed to the plaintiff.
1.) The draw recoverable by the defendants should be a sum of $10,000. This sum was used by the Labor Department in originally calculating any wages possibly owed and, given the language of the contract, provides the most literal interpretation.
2.) The commission from the placement of Dr. Drew should be attributed to the commissions earned in year one of the plaintiff's employment and not divided between two years of employment, as the Connecticut Labor Department as well as the agreement between the parties, calls for commissions to be determined on the date of placement and not when the client's fee is actually received.
3.) The calculations of any owed wages should reflect the fall-offs of the Thompson, Serrano and Moussa accounts.
In the case of the Serrano and Thompson accounts, the court finds that the plaintiff is entitled to a portion of any commission received by the defendant due to the plaintiff's ground work with the institutional client.
In regards to the placement of Dr. Naon, Plaintiff's Exhibit Q would seem to indicate that Dr. Naon was employed by the client and thus successfully placed. Based on this testimony the defendant should not be allowed to include a fall-off of the Dr. Naon placement.
4.) The court finds no evidence of bad faith. However, the sum of past bonuses should be changed to reflect the inclusion of the wrongfully claimed check.
These calculations reveal that the defendant owes the plaintiff a sum of $3,836.50. As there is no evidence of bad faith on the part of the defendant, the above amount is not subject to double damages under § 31-72. Butler v. Hartford TechnicalCT Page 5390Institute, 243 Conn. 454, 470, ___ A.2d ___ (1997).
According to the defendant the total fees to Weatherby from plaintiff's efforts in year 1 were $56,750.00, and year 2 $153,500.00. Based upon these figures the commissions earned by the plaintiff were $2,837.50 and $16,400.00 respectively.[1][2]
The court finds that year 2 should be corrected to include the placement of Dr. Naon. Thus an additional $10,000 is calculated into the total fees. The commission earned by the plaintiff is increased by $4,000 (10,000 x 40%). Year 2 should also include the reduced fees the plaintiff earned for work with the potential employer in the Serrano and Thompson fall-offs. Thus, the plaintiff is entitled to an additional $6,900 (the reduced fees for Serrano and Thompson, a combined $17,250 at 40%).[3] Therefore total fees received by Weatherby in year 2 are $180,750.00, and commission earned by the plaintiff on this amount would be $27,300.00.
Total Commission earned by plaintiff
(for years 1 and 2) would be: 30,137.50 Sums Paid to the Plaintiff:[4] — 16,301.00
Sum owed to the Plaintiff prior to Draw: 13,836.50
13,836.50
Contractual Draw of $10,000 — 10,000.00
Amount Owed to the Plaintiff 3,836.50
Because there is no evidence of bad faith, the plaintiff is not entitled to double damages under § 31-72.
Accordingly, judgment may enter in favor of the plaintiff in the sum of $3,836.50 plus costs.
DAVID W. SKOLNICK, JUDGE